**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

**v.**

**PUNEFU TUAOLO, Defendant.**

High Court of American Samoa
Trial Division

CR No. 30-98

January 31, 2000

Before RICHMOND, Associate Justice, ATIULAGI, Associate Judge and TAUANU'U, Temporary Associate Judge.

Counsel: For Plaintiff, John W. Cassell, Assistant Attorney General

For Defendant, Tautai A.F. Faalevao, Public Defender

## OPINION AND ORDER

Plaintiff American Samoa Government ("ASG") charged defendant Punefu Tuaolo ("Tuaolo") with the crimes of robbery in the first degree (Count 1), felonious stealing (Count 2), felonious restraint (Count 3), and assault in the second degree (Count 4) by the information filed on May 11, 1998. A *Daubert* hearing on the admissibility of certain expert opinion evidence was conducted on December 1-2, 1999. Tuaolo then waived his right to a jury trial. The bench trial commenced on the same date and concluded on December 10, 1999. Tuaolo and both counsel were present throughout the hearing and trial.

### The *Daubert* Hearing and the Court's Rulings

This criminal prosecution presented evidentiary issues of first impression in this jurisdiction: the admissibility of the results of forensic deoxyribonucleic acid ("DNA") comparisons with questioned items of evidence. The DNA examinations, as well as other forensic testing, were done at the Federal Bureau of Investigation ("FBI") laboratory in Washington, D.C. Five members of the FBI laboratory staff were required to present this evidence by testimony before the court. Hence, pursuant to T.C.R.Ev. 104(a) - (c), the parties proposed, and we agreed, that a pretrial hearing on the admissibility issues be conducted during the week before the trial.

T.C.R.Ev. 702 applies to expert opinion testimony. Rule 702 permits a witness who is qualified by knowledge, skill, experience, training, or education to testify by giving an opinion on a matter involving scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue. F.R.Ev. 702 is identical to our local Rule 702. Thus, the parties also agreed, and we concur, that the standard for the admissibility of DNA evidence is governed by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The court must determine, preliminarily in a jury trial, that the basis of the proposed expert opinion testimony is reliable and relevant. *Daubert*, 509 U.S. at 590-91, 594. The Supreme Court held that Federal Rule 702 rejects the traditional test of general acceptance in the relevant scientific community as the basis for admitting novel scientific evidence, as required by *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Under Rule 702, the trial court must still look for such reliability factors as: (a) whether the theory or technique in question has been or can be tested and has been subjected to peer review and publication; (b) the known or potential rate of error of the particular theory or technique and

whether operational control means exist for it; and (c) the extent to which the theory or technique has been accepted. *Daubert*, 509 U.S. at 593-94. Once reliability is satisfactorily established, the court must determine that the evidence is sufficiently related to the facts at issue to assist the trier of fact, and that its probative value substantially outweighs the dangers of unfair prejudice, confusion of the issues, or misleading the trier of fact. *Id.*, at 595; see T.C.R.Ev. 401-403.

Following receipt of the FBI laboratory reports, and prior to the *Daubert* hearing, the parties filed two written stipulations. In essence, the parties stipulated to the admissibility in evidence by way of expert opinion testimony of the results of DNA testing of certain evidence in this case performed by Julie Ann Kidd ("Kidd") and Dr. John E. Stewart ("Stewart"), both FBI laboratory personnel.

However, as part of our learning process, we agreed with ASG's strategy to have Stewart and Kidd testify about their professional qualifications, DNA theory and practice, and the results of their DNA analyses in this case. Based upon the parties' stipulations and particularly the testimonial amplification, we specifically made and reiterate the following findings. First, Stewart and Kidd are qualified by education, training and experience to provide expert opinion testimony in the DNA field. Second, DNA examinations and the DNA analytical protocols applied to the evidence in this case have a scientific basis and are reliable under the *Daubert* standard. Third, Stewart properly performed the DNA procedure called mitochondrial. Kidd properly performed the DNA procedures called restriction fragment length polymorphism ("RFLP") and polymerase chain reaction ("PCR"). Fourth, Stewart's and Kidd's expert opinions on the results of their examinations are relevant, and will assist the trier of fact to understand the DNA evidence and to determine identity of the perpetrator(s) of the crimes charged. The probative value of this evidence substantially outweighs any prejudice and other dangers of unfairness.

During the *Daubert* hearing, ASG also called Monica Knuckles ("Knuckles") of the FBI laboratory to testify as a forensic chemist with respect to her comparative analyses of items of masking tape recovered as evidence in this case. Based upon her testimony, we found and still find the following facts. Knuckles is qualified as a forensic chemist by education, training and experience. The types of analyses she made of the items of masking tape are scientifically reliable under the *Daubert* standard. The results of Knuckles' examinations are relevant to assist the trier of fact to identify the perpetrator(s) of the crimes charged and significantly exceed any prejudicial effects.

*The Trial and the Court's Findings and Conclusions*

299

A. Jury Waiver and Further Stipulations

Shortly after the *Daubert* hearing was concluded, Tuaolo filed a written waiver of his right to trial by jury. On December 6, 1999, before the trial commenced, we again admonished Tuaolo of his right to trial by jury. Tuaolo orally reaffirmed his written decision to waive that right and proceed with a bench trial.

The parties also provided three more stipulations for purposes of the trial. First, before filing the written jury waiver, they stipulated that the statement of Aukusitino Fanene ("Fanene") given to Sgt. Lavata'i T. Sagapolutele ("Sagapolutele") on or about October 26, 1999 may be read to the jury. During the bench trial, without objection, Sagapolutele read Fanene's statement to the court.

During the first day of the bench trial, December 6, 1999, the parties stipulated that the court may take judicial notice of the testimony given by Stewart and Kidd during the *Daubert* hearing in lieu of taking further testimony from them. We take judicial notice of this evidence.

Lastly, during the second day of the bench trial, December 7, 1999, the parties stipulated that based upon Fanene's statement to Sagapolutele, the FBI's DNA analyses, and other evidence, ASG would seek an arrest warrant for Fanene as a principal or accessory to the charges in this case after the bench trial concluded.

B. The Crimes

Well beyond any reasonable doubt, the four crimes charged in this case were committed. At least two accomplices directly participated. A third accomplice was possibly involved either as a principal or abettor.

The offenses occurred at the poker machine center in the Tautua Hall during nighttime, shortly after 3:00 a.m. on April 30, 1998. Tautua Hall is located near the northwesterly side of Pago Park in the Village of Pago Pago. Two victims were present, Ho Min, an owner and the operator of the center, and Beam Fa'alogo ("Fa'alogo"), one of his employees. Both heard noise at one of the entrance doors to the center, just as someone turned off the lights in the center. Two perpetrators wearing black masks entered the center. One of them, a large male, struck Ho Min's head with a shotgun. He pushed Ho Min to the floor and kicked him several times. He demanded money and threatened to kill Ho Min. Ho Min told Fa'alogo to give the perpetrators all the money in the center. The large perpetrator bound Ho Min's hands, feet and face with masking tape. Ho Min heard three shotgun shots. He probably then lost consciousness for a short time. Upon waking, Ho Min was able to remove the tape. He called the police from a telephone outside the center.

The second masked perpetrator went to Fa'alogo. She was in the cashier's office at the center. He had a flashlight and held a shiny handgun on her. She heard Min being struck and scream. Fa'alogo tried to close the door to the office, but her attacker kicked or pushed open the door. He told Fa'alogo, who had fallen to the floor, to kneel and put all the money in the knapsack he threw in front of her. After Fa'alogo put the money in the knapsack, this perpetrator bound her hands, feet and mouth with masking tape. Fa'alogo heard two gun blasts and feared for her life. However, the perpetrators suddenly left the center. She unbound herself and went to help Ho Min. She saw that Ho Min was bleeding from a head injury and appeared to be unconscious. After Ho Min regained consciousness, the police were called.

Three poker machines were damaged by the shotgun blasts. Approximately $1,500 in United States quarter coins were taken from these machines. United States currency in other denominations, totaling approximately $500.00, was taken from the cashier's office. Ho Min's wallet, containing about $650.00 and a VISA credit card, was taken from his person. His and his wife's cellular telephones were also stolen.

## C. The Perpetrators' Identities

We must still solve beyond a reasonable doubt the genuine puzzle of the perpetrators' identities. On May 1, 1998, almost immediately after the crimes were committed, Tuaolo was arrested for the crimes charged. He is, of course, the only accused presently on trial. Fa'alogo identified Tuaolo as her masked attacker, and ASG initiated his prosecution principally on this basis. At the trial, Fa'alogo maintained that Tuaolo is that culprit. This is the strongest evidence of Tuaolo's guilt. Certain factors tend to corroborate Fa'alogo's identification of Tuaolo. Other factors raise questions about her identification. We will review the evidence in substantial detail in analyzing her identification.

## 1. The Surrounding Circumstances

Tuaolo was also employed at the poker machine center. He first worked there during the weekend before the crimes were committed and knew the layout of the premises. However, he did not come to work the night of the charged offenses. On his first night on the job, Tuaolo had a shiny handgun, which he showed to Ho Min and identified as a .38 caliber gun. He took the handgun with him when he left work that night. The handgun was similar to the gun Fa'alogo's attacker held on her. Fa'alogo's attacker was similar to Tuaolo in height, build, and voice. During the attack, she called her attacker "Punefu" and said she was surprised at his conduct.

301

According to Fa'alogo, her attacker wore the off-white shirt and camouflaged "army" pants in evidence. She said that the shirt was yellow, but Fa'alogo saw the shirt by the yellow lens or bulb of her attacker's flashlight. The police arrived at the crime scene within minutes after they were called. A short time later, Tuaolo drove up to the scene in a red pickup. Bobby Tuiletufuga ("Tuiletufuga") is the registered owner of this pickup. Tuaolo was then wearing the off-white shirt and "army" pants.

Tuaolo, Tuiletufuga, and Fanene are long-standing friends. Tuaolo is also a former employee, perhaps as long as eight to 10 years, of ASG's Emergency Medical Service ("EMS") and a long-term friend of EMS employees Teofilo Mageo ("Mageo"), Aukusitino Fruean ("Fruean"), and Christy Moa ("Moa"). Tuaolo attended Mageo's birthday party in Aua during the evening of April 29, 1998. He was driven to the party by Tuiletufuga, who also picked him up there in the early morning of April 30. Fruean and Moa were also at the party. Mageo, Fruean, and Moa consumed considerable quantities of beer at the party.

According to Mageo, Fruean, and Moa, they went to Tuaolo's pool hall in Pago Pago about 2:00 a.m. on April 30. Tuaolo and his wife Mina Tuaolo ("Mina") live in a two-story building behind the pool hall. These two buildings are located very near, not more than a five-minute walk to, Tautua Hall. Tuaolo and Mina were in the pool hall when Mageo, Fruean, and Moa arrived there. They consumed more beer and played pool with Tuaolo. Two other EMS employees stopped by briefly but did not join the pool game. They were on their way to StarKist Samoa for a training exercise involving EMS personnel. At some point during the pool game, Mina retired to her home.

Again according to Mageo, Fruean, and Moa, after Mina and the other EMS visitors left, and some time after 3:00 a.m., Tuiletufuga and Fanene arrived at the pool hall in Tuiletufuga's pickup. Tuiletufuga was screaming or crying out for help and asking Tuaolo to take him and Fanene to the ASG's LBJ Tropical Medical Center ("LBJ") in Faga'alu. They told Tuaolo that they had been shot. Despite their EMS training and experience, Mageo, Fruean, and Moa were not asked to assist Tuiletufuga and Fanene. Instead, Tuaolo drove off with them.

Tuaolo drove Tuiletufuga and Fanene to the LBJ and left them there for medical treatment. Tuaolo then drove the pickup back to Pago Pago and stopped at Tautua Hall during the ongoing initial police investigation at the crime scene. It was then that Fa'alogo observed Tuaolo wearing "army" pants and an off-white shirt.

Mina was also there, apparently having been awakened by crying or other noise from the direction of Tautua Hall. After Tuaolo arrived, he

instructed Mina to drive Tuiletufuga's pickup to their home. She did so. Mina claimed that a roll of new masking tape fell outside when she exited the pickup, and that she took the tape inside, later used it to repair a hand fan, and left it in the bedroom used by Tuaolo and her.

## 2. The Physical Evidence

Police Captain Vaaomalo Sunia ("Sunia"), the head of the Criminal Investigation Division and as such in ultimate charge of the investigation of this case, seized the roll of masking tape from Tuaolo's and Mina's bedroom during the course of the execution of a search warrant on May 1, 1998.[1]

There are numerous other items of physical evidence. We take note of the police investigators' observations and recovery of those items that are particularly significant to this discussion. At the crime scene, they observed Ho Min's injuries, the three damaged poker machines, and a blood stain on the floor near the door to the cashier's office. They recovered from the customer area of poker machine premises, among other items, three empty shotgun cartridges, strips of masking tape near the one entry door to the center, and strips and a roll of masking tape within the cashier's office.

The investigators impounded Tuiletufuga's pickup from Tuaolo's residence. Inside the pickup, they found and took for evidence a black mask from the front right floor, a tee shirt and black pants on the seat, and another black mask underneath this clothing. A cellular telephone was inside the right back pocket of the pants. A pocket knife and two bullets were also found in the pickup. The police also seized the "army" pants and off-white shirt worn by Tuaolo when he returned to the crime scene.

Body samples were also taken, using proper procedures, to provide known submissions for the FBI's DNA analyses. These samples included blood, hair, and saliva from Tuaolo; blood, hair, and saliva from Tuiletufuga; blood and hair from Fanene; and blood from Ho Min. In addition, fingerprints from Tuaolo, Tuiletufuga, Fanene, Ho Min, and Fa'alogo were imprinted and sent to the FBI for comparison.

---

[1] Sunia also interviewed Mina on May 6, 1998. During that interview, she told Sunia that Tuaolo owned a stainless steel revolver, which she last saw on April 28, 1998, and that she did not know where Tuaolo may have "hid" the gun. Mina put her credibility at serious issue during cross-examination when she denied that Tuaolo owned a gun and denied that she made the prior inconsistent statement to Sunia that Tuaolo owned a stainless steel revolver.

### 3. The Statements by Tuaolo and Fanene

After he drove to the crime scene, Tuaolo made oral statements to the police at the crime scene and, later on April 30, a written statement to the police at the central police station. Both statements were admitted into evidence without objection. Tuaolo's statements were essentially consistent with the other evidence in the case.[2]

Fanene and Tuaolo appear similar in height and build. ASG intends to charge Fanene with the same offenses for which Tuaolo in now on trial.[3] Fanene's statement to the police is one basis for this intended action. On October 26, 1999, police Lt. Sagapolutele wrote what Fanene told him about the offenses. Fanene then signed this document. This statement was admitted into evidence pursuant to the parties' pretrial stipulation.

We will set forth the presently important aspects of Fanene's statement. Fanene claimed that Tuiletufuga, threatening him with a shiny handgun, forced Fanene to join Tuiletufuga's plan to commit the offenses. Both wore masks at Tautua Hall. Fanene then had the handgun and a flashlight, and wore black pants and a white shirt, all furnished by Tuiletufuga. Tuiletufuga turned off the lights in the poker machine center and beat the Korean. Fanene admitted that he had the female

---

[2] There are two noteworthy inconsistencies between Tuaolo's written statement and Mina's testimony. First, Tuaolo wrote that Tuiletufuga drove him to Mageo's birthday party in Aua at about 11:00 p.m. on April 29. Mina testified that Tuaolo went to the party at about 6:00 or 7:00 p.m. Second, Tuaolo wrote that after he was picked up at the party, Tuiletufuga drove him to and dropped him off at Tautua Hall. Tuaolo stated he walked into the poker machine center and was there briefly to tell a person identified as Boy Faumuina to look after the center. Then he walked home. Mina, on the other hand, testified that shortly after Tuaolo came to the pool hall from the party, at about 1:00 a.m. on April 30, and before Mageo, Fruean, and Moa arrived, Tuaolo walked to the poker machine premises and returned about 10 minutes later, around 1:30 a. m. Like her prior inconsistent statement to Sunia, Mina' s credibility is put at issue by these inconsistencies. At the very least, they indicate that Mina was prepared to stretch the truth in her effort to help her husband Tuaolo. In fact, Fa'alogo testified that she did not see Tuaolo at the poker machine premises at any time during the evening before the crimes were committed. Tuaolo's visit to the poker machine premises about 90 minutes before the offenses were committed, if it happened, may have been in preparation for commission of the crimes. However, under the evidence, such a finding would be highly speculative.

[3] ASG has charged Tuiletufuga with these crimes. A warrant for his arrest is outstanding.

cashier put money in a bag, and then tied her hands and mouth with masking tape, as Tuiletufuga had instructed him to do. While tying the cashier, he became afraid when the cashier called him Punefu and said she was surprised at what he had done to her, but he finished tying her. A third person appeared, locked the front door, and opened the back door (apparently but not clearly Tautua Hall rather than the center's doors). This third person wore "army" pants and a shirt Fanene said he could not describe. Fanene claimed that he heard five gunshots, one before and four after he left Tautua Hall with the bag of money. A short time later, he and Tuiletufuga met at their car parked near the Mauga guesthouse at the easterly side of Pago Park. He first and then Tuiletufuga drove the car through the park. As they reached Korea House near the far easterly end of the park, Tuiletufuga tried to put on the handgun's safety, but the car hit a cement block. When Fanene grabbed the steering wheel, the gun discharged. Fanene's left arm and Tuiletufuga's right hand were wounded by the discharge. They then headed west. At the Seagull store, Tuiletufuga drove up the hill into that part of Pago Pago village and threw their two guns and the bag of money into a stream bed. Tuiletufuga then drove to Tuaolo's pool hall and asked Tuaolo to take them to the hospital. Fanene denied receiving any money from the robbery, and claimed that Tuiletufuga told him three days later that Tuiletufuga had instructed Tuaolo to recover the guns and bag of money from the stream bed.

## C. Evaluation of Fa'alogo's Eyewitness Identification

The evidence supporting Fa'alogo's eyewitness identification of Tuaolo is significant. She knew Tuaolo as a fellow employee. He was familiar with the premises at Tautua Hall and the poker machine center. She saw him in possession of a shiny handgun, like the gun her attacker held, a few days before the crimes were committed. Her attacker had Tuaolo's height, build, and voice. She believed that her attacker wore "army" pants and, by a yellow light, a yellow shirt. She saw Tuaolo at the crime scene a short time later when he drove there in Tuiletufuga's pickup. He was then wearing "army" pants and an off-white shirt.

Tuaolo, Tuiletufuga, and Fanene were friends. Tuaolo and Tuiletufuga were companions at times during the evening before the crimes occurred. Tuaolo operated a pool hall and lived nearby Tautua Hall. Though not then seen by Fa'alogo, he may have been at the hall, and perhaps in the poker machine center, for a short time about 90 minutes before the crimes were committed. Fanene implicated a third person wearing "army" pants who assisted in committing the crimes. After the crimes took place, Tuiletufuga drove the pickup, with Fanene the passenger, to the pool hall and sought Tuaolo's assistance to take him and Fanene to LBJ for medical treatment of their self-inflicted gunshot wounds. Fanene suggested that Tuaolo was later instructed by Tuiletufuga to

retrieve the perpetrators' guns and the stolen money from the hiding place in the stream bed. Tuaolo certainly had opportunity to directly participate in the crimes.

On the other hand, Fa'alogo's attacker wore a mask and was similar in height and build to both Tuaolo and Fanene. Thus, we consider her eyewitness identification of Tuaolo with caution. Fanene clearly admits that he was Fa'alogo's attacker, while he possessed a shiny handgun and flashlight. He claimed that he wore a white shirt and black pants. Such clothing was found in the pickup. He also clearly identified Tuiletufuga as the second perpetrator who beat Ho Min and suggested that Tuaolo was present as a third culprit. Fanene recited details which only participants in the crimes would likely know. However, Fanene is an accomplice, and we must also evaluate his statement connecting others in the commission of the crimes with caution. Fanene's credibility, to some extent, is also put in question by his unconvincing claim that Tuiletufuga forced him to participate in the crimes.

Despite his physical proximity to the crime scene, Tuaolo's friends and former EMS associates placed Tuaolo at the pool hall at the time of the crimes. Mina, Tuaolo's wife, corroborated the presence of these friends at the pool hall. These witnesses are clearly biased in Tuaolo's favor. Mina's credibility is also doubtful by her prior inconsistent statement concerning Tuaolo's ownership of a shiny handgun. Tuaolo could easily have fabricated this story with Mina and his friends later. However, their testimony still provided an alibi at least for Tuaolo's direct participation in the crimes.

In sum, the accuracy of Fa'alogo's identification of Tuaolo as her attacker must be questioned.

D. The Expert Opinion Testimony

It is the considerable and varied expert opinion evidence in this case that provides the most satisfactory basis for deciding Tuaolo's guilt or innocence. The DNA evidence is particularly illuminating. Using the mitochondrial protocol, Stewart compared the DNA in a hair found in one of the masks recovered by the police from Tuiletufuga's pickup with DNA in the blood samples obtained from Tuaolo, Tuiletufuga, Fanene, and Ho Min. Fanene and Ho Min were excluded as the source of the hair. Tuiletufuga cannot be excluded as the source. The results were inconclusive as to Tuaolo being the source.

Kidd applied both the RFLP and PCR testing procedures. With the RFLP method, she compared the DNA in four blood stains on the tee shirt and several blood stains on the pants recovered by the police from Tuiletufuga's pickup with the DNA in the four known blood samples.

Ho Min was the source of one blood stain on the tee shirt. Tuiletufuga was the source of another blood stain on the tee shirt and one blood stain on the black pants. Fanene was the source of two blood stains on the tee shirt and the remaining blood stains on the pants. Because of these matches, Tuaolo was excluded as the source of any of the blood stains on the tee shirt and pants.

Kidd used the PCR procedure to compare the DNA in several samples of substance found in both masks with the DNA in the four known blood samples. This substance from both masks could be saliva, perspiration and/or nasal secretion. Four samples of this substance were found in the same mask where the hair was found. The results were totally inconclusive with respect to two of these four samples. However, the results showed that there were both major and minor contributors to the other two samples. Fanene is the potential major contributor. Tuaolo, Tuiletufuga, and Ho Min cannot be either determined or excluded as the minor contributor.

Three samples of the substance were removed from the second mask. The testing results showed that Tuiletufuga was the potential major contributor to a reasonable degree of scientific certainty. Because of this finding, Tuaolo, Fanene, and Ho Min are excluded as the sources of the samples in the second mask.

Kidd also used the PCR technique to compare the DNA in a blood stain on the masking tape removed from Tuaolo's bedroom with the four known blood samples. The results showed that both Tuiletufuga and Ho Min are potential sources of this blood stain, but excluded Tuaolo and Fanene as the source.

Knuckles examined the masking tape items recovered by the police at the crime scene. She compared the strips of masking tape found on the floor of the customer area and on the floor of the cashier's office at the poker machine center with the roll of masking tape found in the cashier's office. The strips were different in color, width, and texture from the roll and thus did not originate from the roll. She asked if any other roll of masking tape was seized and later received the roll recovered from Tuaolo's bedroom. The strips of masking tape and this second roll of masking tape are of consistent color, texture, and other physical characteristics, and in chemical composition. However, there was no identifiable tear match between the strips and the second roll. Thus, Knuckles concluded that the strips could have originated from the second roll or tape of similar manufacture.

Terry G. Amburgey ("Amburgey"), also employed in the FBI laboratory, was qualified as an expert in comparative fingerprint identifications. He used several methods most likely to be productive in lifting latent

fingerprints on the two strips of masking tape, the three shotgun shells, the cellular telephone, and the roll of masking tape recovered from Tuaolo's bedroom. He found only one latent fingerprint, the extreme tip of a finger on one set of masking tape strips, but none of probative value on the other items. Amburgey compared the one latent fingerprint with the submitted fingerprints of Tuaolo, Tuiletufuga, Fanene, Ho Min, and Fa'alogo and determined that it was not the fingerprint of any of these persons.

Robert Fram ("Fram"), another FBI laboratory employee, was qualified as an expert in trace evidence comparisons of questioned hair with known hair. Hair comparisons are not a basis for absolute identification of persons. They only determine that for identification purposes, the hairs examined are similar or dissimilar with each other, based on consistent or inconsistent characteristics, or are insufficient for this purpose, due to the presence of both similar and dissimilar characteristics. Fram compared the hair removed from the masks with known hair samples of Tuaolo, Tuiletufuga, and Fanene. The removed hair is similar to Tuaolo's hair and dissimilar to Tuiletufuga's and Fanene's hairs.

The expert opinion testimony concerning fingerprints does not connect Tuaolo to the crimes charged and, in fact, is not helpful in this particular case. The expert opinion testimony concerning trace and DNA mitochondrial examinations of the hair found in the mask is essentially inconclusive with respect to Tuaolo. Even though Tuaolo could be the source of this hair, it is also known that he was in Tuiletufuga's pickup at least after the crimes were committed. The expert opinion testimony concerning the masking tape comparisons shows that the tape apparently used to tie Ho Min or Fa'alogo, or both, may have originated from the roll of masking tape seized at Tuaolo's bedroom or may have only been produced by the same manufacturer. We know that this roll was in Tuiletufuga's pickup after the crimes were committed, but Mina, Tuaolo's wife, explained, reasonably and innocently if believed, how the roll happened to be in the bedroom.

However, the results of the DNA RFLP and PCR examinations are telling. The RFLP testing positively identified Tuiletufuga and Fanene as the sources of the blood stains on the white tee shirt and black pants recovered from Tuiletufuga's pickup and, by his admission, worn by Fanene during the criminal acts. This testing excluded Tuaolo and Ho Min as sources of these blood stains. The PCR process showed that Fanene was potential major contributor of the saliva, perspiration and/or nasal secretion substance removed from one of the masks found in the pickup, and did not exclude Tuaolo, Tuiletufuga, or Ho Min as the minor contributor of the substance. The same process demonstrated that Tuiletufuga was the potential major contributor of the same type of

substance taken from the second mask. The examination supported this finding to a reasonable degree of scientific certainty and thus excluded Tuaolo, Fanene, and Ho Min as sources of the substance in the second mask. The PCR technique also identified Tuiletufuga and Ho Min as potential sources of the blood stain on the roll of masking tape found in Tuaolo's bedroom, and at the same time, excluded Tuaolo and Fanene as sources of this blood stain.

E. Reasonable Doubt

The DNA connections of Tuiletufuga and Fanene with the two masks leads us to have reasonable doubt about Tuaolo's guilt as a principal. This evidence strongly points to them as the certain principal perpetrators of the crimes charged. When coupled, in particular, with Fanene's admissions of committing the crimes with Tuiletufuga, recited in explicit detail, our doubt is reinforced. However, Fanene's implication of Tuaolo's participation in the crimes is questionable and adds to our doubt. In this light, Tuaolo's alibi is also plausible. The evidence certainly falls far short of proving beyond a reasonable doubt that Tuaolo was an accessory to the crimes.

## DECISION

We find Tuaolo not guilty of the four crimes charged in the information.

It is so ordered.